UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED: ___9/18/13___

————————————————————x

CAROL POTASH,

                 Plaintiff,

   - against -

FLORIDA UNION FREE SCHOOL DISTRICT,
DOUGLAS BURNSIDE, Superintendent
of Schools, MICHAEL RHEAUME, Principal,
both sued in their individual capacities,

              Defendants.

————————————————————x

**OPINION AND ORDER**

10 Civ. 3299 (ER)

Appearances:

Michael Howard Sussman, Esq.
Christopher Dale Watkins, Esq.
Sussman & Watkins
Goshen, New York
*Counsel for Plaintiff*

Mark Craig Rushfield, Esq.
Shaw, Perelson, May & Lambert, LLP
Poughkeepsie, New York
*Counsel for Defendants*

RAMOS, D.J.:

      Plaintiff Carol Potash ("Plaintiff") brings this civil rights action pursuant to 42 U.S.C. §

1983 alleging gender discrimination in violation of the Equal Protection Clause of the Fourteenth

Amendment against the Florida Union Free School District (the "District"), Douglas Burnside,

Superintendent of the District, and Michael Rheaume, Principal of the District's middle and high

schools (collectively, "Defendants"). Doc. 1. Defendants now bring a motion for summary

judgment seeking dismissal of Plaintiff's Complaint in its entirety pursuant to Fed. R. Civ. P. 56.

Doc. 21. For the reasons set forth below, Defendants' motion for summary judgment is

GRANTED.

## I. Background

### a. Factual Background

The following facts are based on the Court's independent review of the record, including: (1) the Reply Affirmation of Mark C. Rushfield, Esq., in Support of Defendants' Motion for Summary Judgment ("Rushfield Reply Aff."), Doc. 32; (2) the Affidavit of Paula Aston in Support of Defendants' Motion for Summary Judgment ("Aston Aff."), Doc. 24; (3) the Affidavit of Douglas W. Burnside in Support of Defendants' Motion for Summary Judgment ("Burnside Aff."), Doc. 25; (4) the Affidavit of Michael H. Sussman, Esq., in Opposition to Defendants' Motion for Summary Judgment ("Sussman Aff."), Doc. 29; (5) the Affidavit of Carol Potash in Opposition to Defendants' Motion for Summary Judgment ("Potash Aff."), Doc. 30; (6) Plaintiff's Response Statement of Material Facts Pursuant to Local Rule 56.1 ("Pl.'s Resp. 56.1"), Doc. 27; and (7) Defendants' Reply Statement of Material Facts Pursuant to Local Rule 56.1 ("Defs.' Reply 56.1"), Doc. 34.  The facts are undisputed unless otherwise noted.[1]

---

[1]     Plaintiff, as the party opposing summary judgment, was required to submit a response to Defendants' 56.1 Statement specifically responding to the assertion of each purported undisputed fact by the movant, and, if controverting any such fact, to support her position by citing to admissible evidence in the record.  *See* Local Rule 56.1(b), (d); Fed. R. Civ. P. 56(c) (requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact).  This rule—simple to understand and apply—is designed to assist the Court by narrowing the scope of the issues to be adjudicated and identifying the facts relevant and admissible to that determination.  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001) ("The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties.").

    Unfortunately, Plaintiff's counsel in this case "has once again failed to comply with th[is] straightforward requirement[]."  *Hoefer v. Bd. of Educ. of Enlarged City Sch. Dist. of Middletown*, 10 Civ. 3244 (ER), 2013 WL 126238, at *1 n.3 (S.D.N.Y. Jan. 9, 2013); *see also Risco v. McHugh*, 868 F. Supp. 2d 75, 86 n.2 (S.D.N.Y. 2012) (collecting cases).  Plaintiff's Response to Defendants' Statement of Material Facts Pursuant to Local Rule 56.1 is deficient in several significant respects, *see* Defs.' Reply Mem. 3-5, Doc. 33; Rushfield Reply Aff. ¶¶ 2-10; however, the Court will not expend limited judicial resources scrutinizing each response and explaining why it is improper under the Local Rules of this District and the Federal Rules of Civil Procedure.  It is sufficient to say that many of the responses wherein Plaintiff purports to deny one of Defendants' statements of material fact are improper in that they either do not actually controvert the facts set forth in Defendants' 56.1 Statement, or they purport to deny facts properly set forth by Defendants' 56.1 Statement with a citation to evidence that does not support Plaintiff's purported denial.

       i.  <u>2000-04 School Years</u>

In September 2000, Plaintiff was hired by the District's Board of Education (the "Board")

as a "Technical Assistant," contingent upon successful completion of the required Civil Service

exam.  Potash Aff., Ex. 1.  The Technical Assistant job was a 10-month position with a salary of

$24,515 for the 2000-01 school year.  *Id.*  Plaintiff was responsible for assisting the Orange-

Ulster Counties Board of Cooperative Educational Services ("BOCES") personnel with the

maintenance and repair of computers and computer networking systems within the District,

supporting computer technicians and computer network specialists, installing basic computer

software, and assisting technical personnel with manual work such as moving equipment and

---

The balance of the submissions by Plaintiff's counsel in no way serve to cure the deficiencies in Plaintiff's 56.1 Statement and, indeed, Plaintiff's other submissions simply serve to add to the Court's burden.  First, Plaintiff's Affidavit includes averments that were omitted from her responses to related questions during her deposition, *see, e.g.*, Potash Aff. ¶¶ 30, 36-37, 65; Rushfield Reply Aff. ¶¶ 5-6; or are unsupported and conclusory statements, Rushfield Reply Aff. ¶ 4.  *See Butler v. Raytel Med. Corp.*, 150 F. App'x 44, 46 (2d Cir. 2005) (disregarding, pursuant to the "Sham Affidavit" rule, information in an affidavit that had been "conspicuously omitted" during deposition questioning); *Flaherty v. Filardi*, 03 Civ. 2167 (LTS) (HBP), 2007 WL 163112, at **4-5 (S.D.N.Y. Jan. 24, 2007) (disregarding inadmissible portions of plaintiff's affidavit in analyzing motion for summary judgment).  Second, Plaintiff's Memorandum of Law, while replete with factual arguments which could conceivably have raised a genuine issue of material fact, *contains only one citation to the record* and *extremely limited reference to legal authority*.

However, the Court notes that Defendants' submissions are also replete with errors.  First, as noted by Plaintiff's counsel, Defendants' 56.1 Statement contains several factual claims within each numbered paragraph, which Plaintiff's counsel claims has made it "difficult" to respond to such factual allegations.  Sussman Aff. ¶ 2.  Defendants also fail to include *any* citations to the record in their legal memoranda and merely state:  "In the interest of brevity, the Court is respectfully referred to Defendant's [sic] Statement Under Rule 56.1 in Support of Motion for Summary Judgment, the Affidavits of defendant Douglas Burnside and Dr. Paula Aston and the exhibits submitted therewith and the Affirmation of Marc C. Rushfield, Esq. and the submitted deposition transcript excerpts of the testimony of the plaintiff submitted therewith."  Defs.' Mem. 1, Doc. 26; *see also* Defs.' Reply Mem. 3-5.

The net result of counsels' deficiencies has been to impose on the Court and its limited resources the burden of parsing the entirety of the record to ensure that their clients' claims and defenses receive thorough and just consideration.  Accordingly, the Court "has conducted an independent review of the record, and confirmed that the facts set forth below undisputed."  *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 658 (S.D.N.Y. 2012) (citing *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) ("While a court is not required to consider what the parties fail to point out in their Local Rule 56.1 statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement"); *Ifill v. United Parcel Serv.*, 04 Civ. 5963 (LTS) (DFE), 2008 WL 2796599, at *2 n.2 (S.D.N.Y. July 17, 2008).

installing electronic wires.  *Id.*; *see* Potash Dep. 8.[2]

Plaintiff was supervised by Maureen Flaherty, then-Superintendent of the District ("Flaherty") through the 2002-03 school year, and by interim Superintendent Edward Rhine ("Rhine") for 2003-04.  Potash Dep. 14-15.

Within five or six months of working at the District, Plaintiff began to suspect that she was being underpaid.  She found the job much more demanding than she had initially expected and felt that while she "was called upon to resolve all computer-related issues in the school district," she was not "provided the staff [she] needed to handle all district-related IT functions." Postah Aff., ¶ 5; Potash Dep. 12, 14, 45.  Plaintiff testified that she was told by Flaherty and Rhine that she was underpaid; however, she thought that during the first two years, Flaherty was trying to raise her salary to be comparable to employees in other districts performing the same job functions.  Potash Dep. 39, 43-44.  During her second year, 2001-02, Plaintiff began to suspect that she was being underpaid because of her gender.  *Id.* 45.  During this time, "[she] started to learn about what other people were making," and "[s]ome of them" were men.  *Id.*

Plaintiff also began to suspect discrimination because she was paid on the District's custodian pay scale, even though she was not part of the custodial staff, and "kept getting compared to" Tom Andryshak ("Andryshak"), the District's Buildings and Grounds Coordinator "on the [custodial] salary scales."  *Id.* 46.  However, Plaintiff admits that she was placed on the custodian pay scale because there was no pay scale for computer personnel.  *Id.* 80.  Plaintiff further admits that Andryshak's duties were completely distinct from hers, that he had been employed by the District for "many more years" than she, that he "was a 12-month employee and supervised or coordinated a staff of between five and ten custodians.  Pl.'s 56.1 Resp. ¶ 11;

---

[2] Although she was hired as a Technical Assistant and performed such tasks, the District, unbeknownst to Plaintiff, classified her in the Civil Service title of "School Monitor."  Potash Dep. 9.

Potash Dep. 79.

Under Flaherty's supervision, Plaintiff began receiving a yearly stipend of approximately $1,500.  She believed the stipend amount reflected gender discrimination by Flaherty because Andryshak received a higher stipend.  Potash Dep. 61-62.  Other than by reference to Andryshak, Plaintiff testified that she had no reason to believe that the District was paying her less based on her gender.  *Id*. 49-50.  Meanwhile, Plaintiff's wages increased to $32,876 during the 2001-02 school year, to $40,711 during 2002-03, and to $41,086 during 2003-04.  *Id*. 33-34, 36, 38, 51.

ii.   2004-05 School Year

In summer 2004, Defendant Douglas Burnside was hired as the District Superintendent ("Superintendent Burnside").  Superintendent Burnside was Plaintiff's direct supervisor during the 2004-05 school year.  *Id*. 16-17; Burnside Aff. ¶ 1.  Shortly after he began, Plaintiff informed him that she considered herself to be underpaid.  In response, he approached the Board to request a stipend.  Burnside Aff. ¶ 3; Potash Dep. 55.

On September 24, 2004, Superintendent Burnside informed Plaintiff that the Board had appointed her to the position of "Information Technology Coordinator" for the 2004-05 year and would provide her with a stipend of $2,500.  Burnside Aff., Ex. A.  Plaintiff testified that she did not believe that any of her duties had changed by being appointed to this new position and she considered the stipend to cover duties that she had already been performing.  Potash Dep. 55-56, 58.  She also testified that the stipend amount reflected gender bias because Andryshak was receiving a larger stipend, even though she understood that he was receiving a stipend for coordinating a custodial staff of five to ten full-time District employees while she was only responsible for overseeing one BOCES employee one day per week.  *Id*. 60-61.  Plaintiff also believed that Superintendent Burnside's "attitude" and the fact that "he wasn't coming in and

5

questioning . . . Andryshak's stipend [amount]" reflected gender animus on his part.  *Id.* 68.  She also testified that before Superintendent Burnside was hired, the union had been negotiating with Rhine for a higher stipend for Plaintiff of $4,500 for the 2005-06 school year and $9,000 for 2006-07.  *Id.* 58, 65; Potash Aff., Ex. 10.  During 2004-05, Plaintiff's salary increased to $47,319.94.  Potash Dep. 49-50, 52; *see* Burnside Aff. ¶ 4.

### iii.   2005-06 School Year

In September of 2005, Plaintiff alleges that she met with Defendant Michael Rheaume, Principal at the District's middle and high schools ("Principal Rheaume"), and Susan Moore.[3] During the discussion, Principal Rheaume complained to Plaintiff about the state of the computer network and was "belligerent and loud" to her.  Potash Dep. 382-38.  Afterwards, Plaintiff went to Superintendent Burnside and "complained about Mr. Rheaume's level of anger towards [her] and feeling berated and belittled."  *Id.* 493.  Plaintiff testified that Superintendent Burnside responded by laughing at her and told her that if she wanted to be a director of technology, she would have to learn how to handle administrators.  *Id.* 494.

In November 2005, Plaintiff completed her Master of Education/Curriculum and Educational Technology.  At some point thereafter, she notified Superintendent Burnside that she had obtained an advanced degree and should be compensated accordingly.  *Id.* 85-86.  On January 12, 2006, Plaintiff told Superintendent Burnside that she was qualified for the Civil Service position of "Director of Technology," a position which did not currently exist in the District.  Burnside Aff., Ex. B.  Plaintiff testified that she believed that Superintendent Burnside might not select a woman as a Director of Technology because she had a "feeling" that "he

---

[3] Plaintiff testified that this meeting occurred in September of the first year that Principal Rheaume worked for the District although she cannot recall the specific date or year.  Potash Dep. 382-83.  However, in her Affidavit, she claims that this incident occurred on September 16, 2005.  Potash Aff. ¶ 30.

wasn't confident" in putting a woman in that role.  Potash Dep. 96-99.

In April 2006, Plaintiff wrote a letter directly to the Board complaining of her salary.  In response, Superintendent Burnside decided that he would no longer negotiate with Plaintiff personally and would instead negotiate with the Florida Teachers Association ("FTA"), which represented both teachers and a separate bargaining unit for non-teaching personnel ("SRP"). Burnside Aff. ¶ 5.  Then, on April 10, Superintendent Burnside informed her that, as she had requested, the District created the "Director of Technology" position with an anticipated start date of September 1, 2006 and would be eliminating her current position.  He further stated, "I am hoping that you are interesting in applying" and provided her with a copy of the job posting that the District had created for the position.  The new position was to have to have a salary range of $55,000 to $60,000 for the 2006-07 year.  Burnside Aff., Ex. C.  According to Plaintiff, she understood that this position was created to fit the duties that she had already been performing and there was no intention to increase the duties of her job.  Potash Dep. 104, 111.

On April 12, Plaintiff met with Superintendent Burnside to discuss the new position. According to Plaintiff, he was "angry and irate" and she had a "feeling" that he had been "forced" to create the position for her.  *Id.* 115.  Nevertheless, Plaintiff applied for the position. By letter dated May 4, the Orange County Department of Personnel notified Plaintiff that her application to take the Civil Service exam had been rejected for lack of work experience. Burnside Aff., Ex. D.  The letter explained that they were unable to credit her work experience at her previous employer, Greenwood Lake Union Free School District, and at the District because she had been given the Civil Service title of "Teacher's Aide" while employed at Greenwood Lake and of "School Monitor" by the District.  *Id.*  On May 12, Plaintiff informed Superintendent Burnside that while she did not qualify for the Civil Service exam for Director of

Technology, she qualified for the position of Instructional Technology Specialist, but the District would need to create this position. *Id.*, Ex. E.  In response, Superintendent Burnside recommended that the Board create this position and the Board complied.  Burnside Aff. ¶ 11; Potash Dep. 132-33.

During the 2005-06 school year, Plaintiff received a salary of $48,218.60, including the $2,500 stipend.  Potash Dep. 77, 86; Burnside Aff. ¶ 4.  Plaintiff alleges that Andryshak received a stipend of approximately $6,000, which reflected gender discrimination.  Potash Dep. 77-78.

   iv. <u>2006-07 School Year</u>

On August 23, 2006, the Board appointed Plaintiff as an Instructional Technology Specialist, contingent upon passing the Civil Service exam.  Burnside Aff., Ex. F.  Plaintiff passed the Civil Service exam and at its December 21 meeting, the Board appointed her to the Instructional Technology Specialist position, with a six month probation period, effective December 22, 2006.  Her annual salary was set at $50,000, retroactive to September 1.  *Id.*, Ex. G; Burnside Aff. ¶ 15; Potash Dep. 160-62.  Plaintiff testified that she earned $50,705 in 2006-07.  Potash Dep. 169-70.[4]

According to Superintendent Burnside, the Board imposed a six month probation period at his recommendation; it was his practice to impose the longest probationary period available upon any appointments that he recommended.  Burnside Aff. ¶ 15.  Plaintiff argues that "a janitor" received a shorter probationary period and that this was "a further indication of Burnside's hostile attitude towards [her]."  Potash Aff. ¶ 14; Potash Dep. 227.  She alleges that $50,000 is less than what she would have made if she had remained a Technical Assistant.

---

[4] Plaintiff alleges that after making her an Instructional Technology Specialist, the District *reduced* her salary from $50,705.62 to $44,653.  Potash Aff. ¶ 13.  However, this argument is belied by Plaintiff's sworn deposition testimony that she earned more money during 2006-07 than during the previous school year.  Potash Dep. 170.

Potash Dep. 87, 165-66, 169-70.  Plaintiff further alleges that her salary was "discriminatory" because "it was much lower than the salary others performing the same function in other school districts were provided."  Potash Aff. ¶ 16.[5]

Beginning that school year, Plaintiff's immediate supervisor was Dr. Paula Aston ("Dr. Aston"), a female and the Director of Instructional Support Services.  Aston Aff. ¶ 2.  At the end of 2006-07, Dr. Aston performed an annual evaluation of Plaintiff's performance, which she considered to be "a very positive evaluation of plaintiff's performance that year."  *Id.* ¶ 5; Aston Aff., Ex. B.  However, Dr. Aston did note a need for Plaintiff to improve her cooperation with administrators, by which she was primarily referring to communications with the elementary school principal, Ronald DePace ("DePace") and Principal Rheaume.  According to Dr. Aston, DePace and Principal Rheaume had complained about Plaintiff's lack of responsiveness and inability to meet their schools' technology demands.  Aston Aff. ¶ 5.

### v.   2007-08 School Year

During the 2007-08 school year, Plaintiff's salary increased to $62,200.75.  Potash Dep. 172; Burnside Aff. ¶ 16.  In the annual evaluation of Plaintiff performed at the end of that year, Dr. Aston reduced Plaintiff's grades from "Exceeds Expectations" to "Meets Expectations" in the following areas:  "Responds to tech problems in a timely and thorough manner," "Organizes tasks to achieve maximum results," and "Promotes efficient operation of technology program through expertise and personal commitment."  Aston Aff., Ex. C.  According to Dr. Aston, these reductions were the result of reports from teachers and administrators, including DePace and Principal Rheaume, and of ongoing problems regarding Plaintiff's failure to promptly respond to

---

[5] Plaintiff further states:  "When I reviewed salaries our school district paid for other job classifications, there was not nearly as great a disparity, if any at all, between the salaries Florida paid its staff and the salaries paid for comparable work in other Orange County school districts."  Potash Aff. ¶ 16.

teacher requests and address the schools' technology needs.  Aston Aff. ¶ 6.  Dr. Aston further noted that Plaintiff's responses to the complaints were that she was "too busy to respond more promptly, that she needed more help to perform all the duties her job entailed and that she was underpaid for the level of work required of her . . . ."  *Id.*  Additionally, Dr. Aston downgraded Plaintiff from "Exceeds Expectations" to "Needs Improvement" in the category "Communicates with supervisor in a timely manner," as a result of Plaintiff's habitual failure to advise Dr. Aston of problems and failing to promptly respond to Dr. Aston's communications.  *Id.*; Aston Aff. ¶ 7.  Plaintiff disputes this rating.  Potash Aff. ¶ 24.

In April 2007, Dana Castine ("Castine"), a tenured female elementary school teacher employed by the District, commenced working with Dr. Aston as her administrative intern and teacher on special assignment.  Aston Aff. ¶ 11; Burnside Aff. ¶ 33.

vi.   2008-09 School Year

1.   Discovery of Unused Smart Boards

On September 2, 2008, District staff discovered 5 unused, unopened Smart Boards in the elementary school.  Dr. Aston alleges that teachers and administrators had made repeated demands for Smart Boards each year.  Aston Aff. ¶ 8.  By email that same day, Dr. Aston expressed to Plaintiff her surprise at learning about the existence of the Smart Boards.  Aston Aff., Ex. D.  Plaintiff responded via email that she had "no idea what they [were] or why they [were] there."  *Id.*  Dr. Aston stated that the installation of the Smart Boards became the subject of ongoing problems during the 2008-09 school year.  Aston Aff. ¶ 8; Aston Aff., Ex. E.  Plaintiff disputes Dr. Aston's account and claims that Andryshak was responsible for advising her of the receipt of the Smart Boards and he had failed to do so.  Potash Aff. ¶ 25.

2.   Complaints Regarding Plaintiff's Performance

On August 27, 2008, Plaintiff failed to appear at the new teacher orientation as expected. According to Dr. Aston, Plaintiff had committed to attending the orientation and failed to tell her in a timely manner that she would not be able to attend.  Aston Aff. ¶ 16.  On September 2, Dr. Aston issued a memorandum to Plaintiff concerning her failure to attend the new teacher orientation and making clear that she expected Plaintiff to respond to communications from her within 24 hours during the school year.  *Id*.; Aston Aff., Ex. I.  Plaintiff disputes Dr. Aston's account.  Potash Aff. ¶ 25.

During the 2008-09 school year, Dr. Aston again received complaints from both school principals concerning Plaintiff's lack of responsiveness and failure to perform.  Aston Aff. ¶ 17. On April 7, 2009, she received an email from DePace concerning Plaintiff's failure to honor a commitment that she had made to him to send out certain reminders to his teachers and her failure to fix a nonfunctioning Smart Board for an entire year.  He noted that Plaintiff's reaction to the Smart Board incident was to offer a "flip response."  Aston Aff., Ex. J.

During summer 2009, Plaintiff advised Dr. Aston that she had arranged for a training video, titled "Right to Know," to be ready for viewing on the District's network at the beginning of September.  However, as a result of multiple access problems, non-teaching staff were still unable to watch the video on September 10, 2009.  Aston Aff. ¶ 24; Aston Aff., Ex. N.

On September 2, 2009, the network was down in the middle school wing and Plaintiff reported to Dr. Aston that "the wing was running off of the oldest switches we have."  Aston Aff., Ex. L.  According to Dr. Aston, while a person in Plaintiff's position should have been capable of dealing with the issue, Plaintiff instead contacted BOCES to have them do the work. Aston Aff. ¶ 22.

11

3.  Plaintiff's Exclusion from the Technology Grant Committee

During 2008-09, in light of the District's growing technology needs, and Plaintiff's

claims that the duties of her position were too much for one person, Dr. Aston placed Castine,

her administrative intern, on a committee to assist with the implementation of a federal

technology grant.  *Id*. ¶¶ 12-13.  Plaintiff alleges that Superintendent Burnside excluded her from

participating on the committee although she admits that she does not actually know whether he

had any involvement in such decision.  Potash Dep. 218, 224.

4.  Creation of the Senior Computer Network Specialist Position

On October 2, 2008, Plaintiff and Dr. Aston made a presentation to the Board which

highlighted the District's increasing technology needs, Aston Aff. ¶ 9, and proposed two options

related to staffing:  (1) Option A, under which the District would hire a Network Specialist as a

12-month employee to manage the District's servers and infrastructure and share troubleshooting

responsibilities with a 10-month Instructional Technology Specialist; and (2) Option B, under

which the District would not only hire a Network Specialist and maintain the Instructional

Technology Specialist, but would also hire a part-time technician to assist with daily work order

requests, monitor hardware, software, wiring and supplies, all of which were currently Plaintiff's

responsibility.  *Id*.; Aston Aff., Ex. F.  Both proposals would allow the District to cease paying

for the BOCES computer network specialist who assisted Plaintiff.  Aston Aff. ¶ 10; Burnside

Aff. ¶ 20.[6]

The Board ultimately rejected the proposal to employ both a Network Specialist and

Instructional Technology Specialist as too expensive.  Instead, the Board decided to abolish

Plaintiff's position, Instructional Technology Specialist, to create the Civil Service position of

---

[6] Other than the fact that her salary was not increased, Plaintiff did not see the proposals as evidence of gender discrimination.  Potash Dep. 216-17.

Senior Computer Network Specialist as a 12-month position, and to appoint a full-time

Computer Technician to assist the Senior Computer Network Specialist.  Aston Aff. ¶ 10.

In February 2009, Superintendent Burnside and Dr. Aston met with Plaintiff to inform

her of the Board's decisions.  They also told her that she was going to be offered the higher

paying Senior Network Specialist position, and that the District would cease using BOCES

because the full-time technician would take over much of the troubleshooting.  *Id.* ¶ 19; Burnside

Aff. ¶ 22; Potash Dep. 231, 234-36, 240.  They also informed Plaintiff that she would be the only

person taking the Civil Service exam for this new position and that she would be promoted

subject to passing the exam.  Aston Aff. ¶ 19; Burnside Aff., Ex. H; Potash Dep. 242-44.

According to Dr. Aston, during the meeting, Plaintiff claimed that the District was

making this change to get rid of her because she would not be able to pass the Civil Service test.

Aston Aff. ¶ 20; Burnside Aff. ¶ 23.  In her deposition, Plaintiff testified that the District created

this position so that they could give her an additional probationary term and then fire her.  Potash

Dep. 237, 378.  When asked to explain why she thought this position was created to get rid of

her, Plaintiff testified:  "This was a . . . job that the BOCES personnel came in and did.  I never

wanted to be a senior computer network specialist per se.  I wanted to be a director of

technology.  I feel they created that position that I never talked about or wanted, knowing they

were going to get rid of BOCES and make me now do all of that work as well."  *Id.* 238.

Plaintiff also testified that while she understood that the new position added additional

responsibilities, some of the website responsibility would be reassigned.  *Id.* 376-77.

Dr. Aston alleges that despite the problems she had had with Plaintiff's performance

during the preceding months and years, she did not oppose Plaintiff's assignment to the new

position and stated, "I hoped that with the assistance of a full-time Computer Technician to take

over much of the troubleshooting . . . and the expansion of her position to a 12-month position, she would be able to perform the new job." Aston Aff. ¶ 18.

On June 18, 2009, the Board appointed Plaintiff as Senior Computer Network Specialist effective July 1. The appointment was contingent upon passing the Civil Service exam, carried a six month probationary period, and her salary, to be adjusted through union negotiations, would be increased to $65,152. Burnside Aff. ¶ 25; Burnside Aff., Ex. J. After negotiations, her salary was increased to over $73,000. Burnside Aff. ¶ 26; Potash Dep. 264. According to Plaintiff, this salary was still too low because Rich MacAluso, a male, had asked, but not received, $98,000, for that position. Potash Dep. 265.

### 5. Payment for 2008 Summertime Work

The Plaintiff worked for 10 days during July and August 2008 while she was still in the 10-month position of Instructional Technology Specialist. She sought reimbursement for this work months later on April 16, 2009. Potash Dep. 173-77; Potash Aff., Ex. 51. On April 30, Superintendent Burnside denied her request for payment because there was no record of any request being made for her to work on the dates specified. Potash Aff., Ex. 51. Plaintiff contends that in prior years she had not been required to request permission before performing summer work. Potash Dep. 183. Nevertheless, the FTA entered into an agreement with the District whereby Plaintiff received payment for 5 days. Potash Aff., Exs. 5, 53.

Plaintiff alleges that at some point during the dispute regarding the summer pay, she spoke to Superintendent Burnside, who accused of her of lying. Potash Dep. 192-94. Plaintiff testified that during this conversation, she asked him if Andryshak was required to establish that he had worked on particular days and that this question made him "angrier," and he later told Plaintiff that he would have paid her for all 10 days of work if she had "sucked up." *Id*. 195.

14

Superintendent Burnside contends that as a 12-month employee, Andryshak was required to work throughout the summer.  Burnside Aff. ¶ 43.

### 6.  May 22, 2009 Telephone Call

On May 22, 2009, Plaintiff sent Superintendent Burnside an email discussing a telephone call that they had had, in which she stated, "I just want you to know that I will work on the things you have discussed with me."  Potash Aff., Ex. 54.  According to Plaintiff, during the call, Superintendent Burnside told her that she needed to "suck up" and learn to work with administrators."  Potash Dep. 398.  He further told Plaintiff that she needed to "act more like" Rob Gravelle, a male athletic director, because "he took everything in stride."  *Id.*

### vii.  2009-10 School Year

### 1.  Hiring of Support Staff for Plaintiff

During summer 2009, the District created a part-time position to manage the District's website.  The Board hired Brian Slevin ("Slevin"), a male teacher, who according to Superintendent Burnside, was the only person who applied for the position.  Burnside Aff. ¶ 28; *see also* Potash Dep. 272.  According to Superintendent Burnside, Slevin was hired to address concerns that Plaintiff had expressed about the quantity of the work she would have to perform in her new position.  Burnside Aff. ¶ 28.  Before Slevin's hire, Plaintiff was responsible for managing the website.  Potash Dep. 268.

On August 19, the District provisionally appointed Richard Klein ("Klein") as the Computer Technician to assist Plaintiff.  Aston Aff. ¶ 21; Burnside Aff., Ex. K.  Plaintiff took issue with the fact that she was not allowed to "supervise or evaluate him," unlike Andryshak "who was permitted to supervise his subordinates."  Potash Aff. ¶ 20.  She further alleges that Dr. Aston "interfered and essentially assigned Klein as she saw fit."  *Id.*  Plaintiff finally

contends that Dr. Aston and Principal Rheaume gave Klein preferential treatment, despite the

fact that Klein had been subjected to verbal counseling by Dr. Aston in November 2009.  Potash

Dep. 279.  Additionally, Plaintiff testified that on several occasions, when Klein did not

complete an assignment, Principal Rheaume "did not react explosively" with him as he did with

Plaintiff, with whom he would take a "more aggressive" tone.  *Id*. 281-82.

### 2.   Dr. Aston's 2008-09 Evaluation

On September 11, 2009, Dr. Aston prepared Plaintiff's evaluation for the 2008-09 school

year.  Aston Aff., Ex. H.  In comparison with the prior year's evaluation, Plaintiff's grades were

reduced from "Meets Expectations" to "Needs Improvement" in the categories "Responds to tech

problems in a timely and thorough manner" and "Organizes tasks to achieve maximum results."

*Id*.  In Dr. Aston's summary section, she noted the Smart Board problems that had arisen in

September 2008 and had not been resolved by May 2009, nor had the problems that she had

reaching Plaintiff.  Dr. Aston once again classified Plaintiff as "Needs Improvement" in the

category "Communicates with supervisor in a timely manner."  According to Dr. Aston, the

grade was not based solely on Plaintiff's failure to inform her of problems on a timely basis, but

also on Plaintiff's failure to attend the new teacher orientation.  Aston Aff. ¶ 16.  The evaluation

also noted that Dr. Aston had previously mentioned to the Plaintiff that it was "important that

[Plaintiff] make people feel that she was interested in their problems."  *Id*. ¶ 17.

### 3.   Meetings & Memoranda Regarding Plaintiff's Job Performance

As issues arose with Plaintiff's performance, Dr. Aston expressed her concerns to

Superintendent Burnside.  He instructed her to meet with and communicate her concerns to

Plaintiff and, if warranted, to formally document her concerns in counseling memoranda.

Superintendent Burnside also advised Dr. Aston that under the Civil Service Law, he had to

16

receive a memorandum concerning the Plaintiff's performance at least two weeks prior to the

end of her probationary period for the purposes of making a determination as to whether she had

successfully completed probation.  Aston Aff. ¶ 25; *see also* Burnside Aff. ¶¶ 29-30.

On September 18, 2009, Dr. Aston issued Plaintiff a memorandum concerning issues

from the first two weeks of the school year.  Aston Aff., Ex. O.  Dr. Aston's concerns included,

*inter alia*, Plaintiff "[r]epeatedly being inaccessible," "[n]ot complying with administrative

requests in a timely fashion," responding to requests with sarcasm, hostility, or disinterest, and

failing to make the video Right to Know available for all personnel.  *Id.*

On November 13, Dr. Aston met with Plaintiff and issued a formal counseling

memorandum which reiterated her performance concerns, and specifically noted:

- "When you are asked to make arrangements for things, you need to check
  everything out in advance and make sure that your part is taken care of, so there
  are no delays or snags.  For example, Tuesday, November 3 was Superintendent's
  conference day.  You had assured us that removing 'blocks' at Golden Hill for the
  day would be no problem.  However, at 7:30, when . . . [the] conference day
  began, the 'blocks' had not been removed.  Further, we had been unable to get a
  hold of you on either cell phone:  yours or the [D]istrict's."

- "You must be accessible at all times.  This is a recurring problem.  It was only
  recently, when I asked about it, that you informed me that your cell phone had 'no
  service.'"

Aston Aff., Ex. P.  Dr. Aston further noted:

> The [D]istrict has taken pains to remove a number of responsibilities from your
> plate, re:  instructional technology.  I personally interface with people in such a
> way as to defer demands away from you.  My greatest frustration is that I never
> hear you say:  'Yes, I need to pay a little more attention to that.'  Instead of
> figuring out how to work 'smarter,' . . . you get angry about your perception of
> being asked to work 'harder.'

*Id.*  Plaintiff disputes Dr. Aston's allegations.  For example, Plaintiff testified that she had asked

BOCES to remove the 'blocks' for Superintendent's Day and that she was unaware that they had

17

failed to do so.  Potash Dep. 333-34.

Thereafter, as a result of what Dr. Aston describes as Plaintiff's "continuing inability to resolve" the Right to Know video issues, she met with Plaintiff on November 20 and on November 24 issued a second counseling memorandum.  Aston Aff. ¶ 28; Aston Aff., Ex. Q. The memorandum discussed the problems with the video set-up and stated that as a result of Plaintiff's failure to follow through with assigned tasks, Dr. Aston was being forced to assume some of Plaintiff's responsibilities.  Aston Aff., Ex. Q.  Also on November 24, Dr. Aston met with Plaintiff for another counseling session concerning her failure to properly set up a Smart Board for a teacher as directed since September 1, and followed up with another counseling memorandum on November 25.  Aston Aff. ¶ 29; Aston Aff., Ex. R.

Meanwhile, during the second or third week of November, Dr. Aston requested that Principal Rheaume provide her with a letter discussing Plaintiff's performance at his school. Aston Aff. ¶ 30.  She requested the letter because she "was aware that Mr. Rheaume, whose school had greater technology demands than the elementary school, had suffered multiple disappointments with the [P]laintiff's performance in that position over recent months."  *Id*.  On November 25, Principal Rheaume provided Dr. Aston with a letter addressing three issues that had arisen since August 2009:

- Plaintiff failed to conduct a thorough check of the system prior to providing a training session on SchoolTool.  As a result, during training, staff could not log on, nor could the system handle the volume of usage.

- Plaintiff failed to provide wireless access in the cafeteria for Back to School Night by 2 p.m. that day.  The access was not provided until 2:50 p.m.  This resulted in a delay of the presentation to 300 parents.  The request had been made at least one week prior.

- When installing a Smart Board, Plaintiff did not have the hardware required to complete the installation.  When it was installed, it was not in working

18

> condition.  It was then replaced by one that was too small.  In addition, the
> wiring was left in an unsafe condition.

Aston Aff., Ex. S.  He further noted that Plaintiff:

> [I]n my opinion, does not perform the necessary background work to successfully
> accomplish a task.  When she is questioned about the lack of follow through, she
> becomes defensive and increasingly uncooperative.  There is a consistent pattern
> of this behavior, accompanied by a negative attitude.

*Id.*  Plaintiff disputes the content of Principal Rheaume's letter.  For example, she testified that

the problem with SchoolTool was that the teachers were not properly following her instructions,

Potash Dep. 466-67, and that the Smart Board installation issue was Klein's job, and not hers.

*Id.* 461.

On December 3, Dr. Aston spoke with Plaintiff and discussed Principal Rheaume's letter.

She also "made clear" that Plaintiff had not satisfactorily completed her probationary period and

that she would provide the various counseling memoranda and Principal Rheaume's letter to

Superintendent Burnside for his review.  Aston Aff. ¶ 31.  Dr. Aston followed up the

conversation with a counseling memorandum dated that same day.  Aston Aff., Ex. T.

According to Plaintiff, during the December 3 meeting, Dr. Aston told Plaintiff that Principal

Rheaume's letter would get her fired.  Potash Dep. 498.[7]

On December 4, Dr. Aston provided a memorandum to Superintendent Burnside which

advised him that Plaintiff's performance had not improved and attaching the September 18

memorandum, the four counseling memoranda, and Principal Rheaume's November 25 letter.

Aston Aff. ¶ 32; Burnside Aff., Ex. L.  Dr. Aston intended by her memorandum to recommend to

Superintendent Burnside that Plaintiff be terminated at the conclusion of her probationary period.

---

[7] Plaintiff claims that Dr. Aston told her on more than one occasion that Principal Rheaume's November 25 letter
would get her fired.  Potash Dep. 498.

Aston Aff. ¶ 32; *see also id.* ¶ 2.  Based on Dr. Aston's recommendation, Superintendent

Burnside recommended to the Board that it terminate Plaintiff's employment.  Burnside Aff. ¶

31.  On December 17, the Board adopted a resolution terminating Plaintiff's probationary

employment effective December 28, 2009.  *Id*. ¶ 32; Burnside Aff., Ex. M.

   After Plaintiff's termination, Castine assumed Plaintiff's duties for the remainder of the

2009-10 school year with the assistance of BOCES technicians.  Burnside Aff. ¶ 36; Aston Aff. ¶

33.  In a June 30, 2010 evaluation of Castine, Dr. Aston noted:  "In the area of technology, you

voluntarily assumed most of the job tasks of our previous technology manager after that person

left the district mid-year.  You did this with the blessing and appreciation of the superintendent

and me, saving the district from chaos and a financial squeeze . . . People are already

commenting on the vast improvement in services."  Aston Aff., Ex. V.  The following year, the

District created the position of Director of Technology Integration for Castine, and upon

Superintendent Burnside's recommendation, the Board appointed Castine to the position.  The

position had starting base salary of $87,500 and was subject to a three year probationary period.

Burnside Aff. ¶ 37; Burnside Aff., Ex. P.[8]

   viii.   Additional Allegations of Discrimination

   Plaintiff alleges that at some unspecified point in time, she told Dr. Aston that she felt

that Superintendent Burnside was not paying her what she deserved because she was a woman

and that Dr. Aston allegedly responded, "[W]e have all felt it, don't you think we all feel it[?]"

Potash Dep. 251-52.  Dr. Aston then "spread her hand in front her," by which Plaintiff

---

[8] In her opposition papers, Plaintiff argues that "[t]he defendants' suggestion that Dana Castine replaced plaintiff is false as she lacked the technical ability, experience or knowledge to handle the system administrator position. Defendants make this suggestion because Castine is a female," Pl.'s Opp. Mem. 8-9, and "[l]ikewise, a reasonable jury could reject defendants' false claim that Castine replaced plaintiff."  *Id*. at 13-14.  Plaintiff fails to offer any evidence to dispute the fact that Castine assumed Plaintiff's responsibilities with the assistance of BOCES personnel.

understood her to be pointing to the office of Lisa Tiger, another woman.  *Id*. 254-55.  Plaintiff

further alleges that, at some point when discussing her pay and job duties, Dr. Aston told

Plaintiff that "people were out to get [her]."  *Id*. 255.  Dr. Aston denies telling Plaintiff that she

had experienced sexism or that people were out to get her.  Aston Aff. ¶ 36.

Plaintiff testified that over a three-year period she saw Principal Rheaume "speak

aggressively or with aggression or irritation in his tone" to two female teachers, each on one

occasion.  *Id*. 284.  She further testified that other female teachers at the high school, naming five

and stating that there were "several others," had told her that they had been subjected to

discriminatory treatment by Principal Rheaume.  *Id*. 494-95.  Specifically, these teachers all told

her that Principal Rheaume was a "woman hater."  *Id*. 496.  She also testified that two male

employees, and "several others over the years," complained about Principal Rheaume being a

"woman hater."  *Id*.  Plaintiff also believes that Principal Rheaume engaged in gender

discrimination by telling her five or six times over the course of four years that he wanted to

bring in the BOCES technician, who was male, when there were IT problems.  However,

Plaintiff admitted that there were no female BOCES technicians at the District.  *Id*. 299-301.

She also testified that Principal Rheaume expressed gender discrimination through "lots of body

language and mannerisms [and he] could not look [Plaintiff] in the eye."  *Id*. 303.

Finally, Plaintiff testified that when she was an Instructional Technology Specialist,

Principal Rheaume yelled at her and said "I know people like you, you just want my job."  *Id*.

384.  According to Plaintiff, Dr. Aston was present during this incident and afterwards Plaintiff

told Dr. Aston that Principal Rheaume hated her because she's a woman.  Dr. Aston responded

that Plaintiff should never have to sit and listen to those comments.  *Id*. 386-87.

## II. Legal Standard for Summary Judgment Motions

### a. General Summary Judgment Standard

Summary judgment is only appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free School Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the relevant law. *Id.* The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex Corp.*, 477 U.S. at 322-23).

The burden then shifts to the party opposing summary judgment to present evidence that is sufficient to satisfy every element of the claim and "designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. 317 at 324 (quotation marks omitted). "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (quoting *Celotex Corp.*, 477 U.S. at 322).

In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Brod v. Omya*, Inc., 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp*., 368 F.3d 123, 126 (2d Cir. 2004)).  However, in opposing a motion for summary judgment, the non-moving part may not rely on unsupported assertions, conjecture or surmise.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  A motion for summary judgment cannot be defeated on the basis of mere denials or unsupported alternative explanations of facts.  *Senno*, 812 F. Supp. 2d at 467.  The non-moving party must do more than show that there is "'some metaphysical doubt as to the material facts,'" *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986)), "[she] must set forth significant, probative evidence on which a reasonable fact-finder could decide in [her] favor."  *Senno*, 812 F. Supp. 2d at 467-68 (citing *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 256-57 (1986)).

### b.   Summary Judgment Standards for Employment Discrimination Cases

Courts are cautious in granting summary judgment in employment discrimination cases where the employer's intent is at issue, *Holcomb v. Iona Coll*., 521 F.3d 130, 137 (2d Cir. 2008); however, "'[s]ummary judgment is appropriate even in discrimination cases, for . . . the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to other areas of litigation.'" *Hongyan Lu v. Chase Inv. Serv. Corp*., 412 F. App'x 413, 415 (2d Cir. 2011) (quoting *Weinstock v. Columbia Univ*., 224 F.3d 33, 41 (2d Cir. 2000), superseded by statute on other grounds as stated in *Ochei v. Coler/Goldwater Mem'l Hosp.*, 450 F. Supp. 2d 275, 282 (S.D.N.Y. 2006)).  Indeed, "'[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination

cases.'" *Feingold v. N.Y.*, 366 F.3d 138, 149 (2d Cir. 2004) (quoting *Abdu-Brisson v. Delta Air Lines, Inc*., 239 F.3d 456, 466 (2d Cir. 2001)).  Furthermore, "[e]ven in the discrimination context . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb*, 521 F.3d at 137; (citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).  A "nonmoving party 'must offer some hard evidence showing that its version of the events is not wholly fanciful.'" *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998)).

"[S]ummary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial.  There must either be a lack of evidence in support of the plaintiff's position, or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer v. Norden Sys. Inc*., 151 F.3d 50, 54 (2d Cir. 1998) (internal citations omitted).  "Nonetheless, when an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer." *Walder v. White Plains Bd. of Educ*., 738 F. Supp. 2d 483, 493 (S.D.N.Y. 2010) (citation omitted); *see also Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997) (same); *Meloff v. N.Y. Life Ins. Co*., 51 F.3d 372, 375 (2d Cir. 1995) (same).

### III. Discussion

Plaintiff asserts that Defendants violated her rights under the Equal Protection Clause of the Fourteenth Amendment by subjecting her to inferior terms and conditions of employment and terminating her position on the basis of her gender.  Compl. ¶¶ 66-67.  As explained above, *supra* note 1, counsel fails to cite to evidentiary support for Plaintiff's allegations and includes

only limited citations to relevant legal authority.  Accordingly, the Court has reviewed the entire

record in order to ensure that Plaintiff's claims receive thorough and just consideration.

### a.   Legal Standard for Equal Protection Clause Discrimination Claims

An employee is deprived of her equal protection right to be free from gender

discrimination "when she is treated differently from other similarly situated employees, thus

suffering 'disparate treatment because of gender.'"  *Annis v. Cnty. of Westchester,* 136 F.3d 239,

245 (2d Cir. 1998) (quoting *Saulpaugh v. Monroe Community Hosp.,* 4 F.3d 134, 144 (2d Cir.

1993)).  In the Second Circuit, employment discrimination claims brought under the Equal

Protection Clause are analyzed under the same three-step *McDonnell Douglas* test for claims

brought pursuant to Title VII of the Civil Rights Act of 1964.  *Flaherty v. Massapequa Pub.

Sch.*, 752 F. Supp. 2d 286, 295-96 (E.D.N.Y. 2010), *aff'd*, 462 F. App'x 38 (2d Cir. 2012) (citing

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)); *Feingold,* 366 F.3d at 159

("[Plaintiff's] equal protection claim parallels his Title VII claim.  The elements of one are

generally the same as the elements of the other and the two must stand or fall together.").

Under the *McDonnell Douglas* test, a plaintiff must first demonstrate a *prima facie* case

of discrimination.  411 U.S. at 802.  In order to do so, a plaintiff must show that:  (1) she is a

member of a protected class; (2) she was qualified for the position in question; (3) she suffered

an adverse employment action; and (4) the adverse action took place under circumstances giving

rise to an inference of discrimination.  *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491-92 (2d Cir.

2010).  The Second Circuit has explained that a plaintiff's burden at this stage is *de minimis*.

*Abdu-Brisson,* 239 F.3d at 467.  Nonetheless, in order to state a *prima facie* case of

discrimination, "a plaintiff must proffer some admissible evidence of circumstances that would

be sufficient to permit an inference of discriminatory motive," *Bennett v. Watson Wyatt & Co.,*

136 F. Supp. 2d 236, 246 (S.D.N.Y. 2001), *aff'd*, 51 F. App'x 55 (2d Cir. 2002), and cannot meet

its burden through reliance on unsupported assertions, *Goenaga*, 51 F.3d at 18, or "[s]tatements

that are devoid of any specifics, but replete with conclusions." *Griffin v. Ambika Corp.,* 103 F.

Supp. 2d 297, 308 (S.D.N.Y. 2000).

        If a plaintiff successfully presents a *prima facie* case, a presumption of discrimination

arises, which the defendant must then rebut by offering legitimate and non-discriminatory

reasons for the adverse employment action demonstrated in the plaintiff's *prima facie* case.

*Abdu-Brisson,* 239 F.3d at 468 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248,

254 (1981)).  The defendant's burden at this step of the analysis is also "light."  *Greenway v.*

*Buffalo Hilton Hotel,* 143 F.3d 47, 52 (2d Cir. 1998).  "The employer need not *persuade* the

court that it was motivated by the reason it provides; rather, it must simply articulate an

explanation that, if true, would connote lawful behavior."  *Id.*  The Supreme Court has explained

that defendant's burden "is one of production, not persuasion; [and] it 'can involve no credibility

assessment.'"  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (quoting

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).  If the defendant satisfies its burden

at the second step of the test, "the presumption raised by the *prima facie* case is rebutted" and

"drops from the case," *Burdine*, 450 U.S. at 255, 255 n.10, "and the sole remaining issue [is]

discrimination *vel non*."  *Reeves*, 530 U.S. at 143 (internal quotation marks omitted) (quoting

*U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983)).

        Under the third step of the *McDonnell Douglas* framework, the burden then shifts back to

the plaintiff to prove by a preponderance of the evidence that the defendant's articulated reason

for the adverse employment action is merely a pretext for actual discrimination.  *Mandell v.*

*Cnty. of Suffolk*, 316 F.3d 368, 380-81 (2d Cir. 2003).  Under Title VII, a plaintiff can establish

an unlawful employment practice by demonstrating that sex was "*a motivating factor* for any

employment practice, even though other factors also motivated the practice."  42 U.S.C. §

2000e–2(m) (emphasis added).

It is important to note, that "[a]lthough intermediate evidentiary burdens shift back and

forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the

defendant intentionally discriminated against the plaintiff remains at all times with the

plaintiff.'"  *Reeves*, 530 U.S. at 143 (quoting *Burdine,* 450 U.S. at 253).  In determining whether

the plaintiff has satisfied this burden, the Court must consider the sum of all evidence of

discrimination in its totality, and "examine the record as a whole, just as a jury would, to

determine whether a jury could reasonably find an invidious discriminatory purpose on the part

of an employer."  *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001).

### b.  Plaintiff's Pay Discrimination Claims

Plaintiff alleges that she was subjected to pay-based discrimination on account of her

gender in the following instances:  (1) she was grouped for salary purposes with Andryshak and

received lower stipends and salary, Pl.'s Opp. Mem. 6; (2) the District gave her replacement,

Castine, a salary of $87,500 "for the discharge of fewer functions" while Castine "had far fewer

years doing Instructional Technology and was unqualified . . . to do systems or network

administration," *id*. at 20; (3) other individuals performing similar duties in other districts were

"paid more," *id*. at 19-20; (4) the District gave Slevin a stipend for managing the District website

and running teacher support workshops while eliminating Plaintiff's stipend for performing these

duties in 2006, *id*. at 7; and (5) Flaherty and Rhine told Plaintiff that she was underpaid.  *Id*. at 6.

When a plaintiff seeks to establish a *prima facie* case of disparate pay under Title VII,

she must show:  (1) that she was a member of a protected class; (2) that she was paid less than

27

similarly situated non-members of her protected class; and (3) evidence of discriminatory

animus.  *Kearney v. ABN AMRO, Inc.*, 738 F. Supp. 2d 419, 426 (S.D.N.Y. 2010) (citing *Thomas

v. iStar Financial, Inc.,* 438 F. Supp. 2d 348, 367 (S.D.N.Y. 2006)).  Defendants concede that, as

a woman, Plaintiff is a member of a protected class.  However, they contend that Plaintiff cannot

satisfy the "similarly situated" and "discriminatory animus" prongs.  Defs.' Mem. 10.[9]

When a plaintiff seeks to meet her prima face case by reference to the disparate treatment

of an allegedly similarly situated employee, "the plaintiff must show that she shared sufficient

employment characteristics with that comparator so that they could be considered similarly

situated."  *McGuinness v. Lincoln Hall,* 263 F.3d 49, 53 (2d Cir. 2001).  "This means that such

an employee must be similarly situated in all material respects—not in all respects and that a

plaintiff is not obligated to show disparate treatment of an identically situated employee."

*Kearney*, 738 F. Supp. 2d at 426 (quoting *McGuinness,* 263 F.3d at 54) (internal quotation marks

omitted).  Further, such employee "must have a situation sufficiently similar to plaintiff's to

support at least a minimal inference that the difference of treatment may be attributable to

discrimination."  *Id.* (quoting *McGuinness,* 263 F.3d at 54) (internal quotation marks omitted).

Employment characteristics which can support a finding that two employees are "similarly

situated" include "similarities in education, seniority, performance, and specific work duties,"

---

[9] Plaintiff argues, in the alternative, relying on *Back v. Hastings On Hudson Union Free School District*, 365 F.3d
107 (2d Cir. 2004), that she "can prove gender discrimination without [a] comparative analysis . . . ."  Pl.'s Opp.
Mem. 20; *see also id*. 15.  In *Back*, a case involving gender discrimination, the Second Circuit addressed the
questions of whether stereotyping about the qualities of mother is a form of gender discrimination, and whether this
can be evaluated without evidence of how an employer treated similarly situated fathers.  Plaintiff alleged that she
was denied tenure as an elementary school psychologist and subsequently terminated because her employer assumed
that, as a young mother, she could not maintain the required dedication to her job.  Plaintiff presented evidence of
discriminatory comments based on stereotypes of working mothers.  365 F.3d at 115, 120.  The court held that
although plaintiff would have presented a stronger case if she had put forth comparative evidence of how fathers
were treated, such comparative evidence was not required to survive summary judgment.  *Id*. at 122.  The court
concluded that "stereotyping of women as caregivers can by itself and without more be evidence of an
impermissible, sex based motive."  *Id.*  Here, in contrast, there is no claim of employment discrimination based on
stereotyping and, moreover, Plaintiff does rely on evidence of comparators in asserting her claims for disparate pay.

*DeJesus v. Starr Technical Risks Agency, Inc.*, 03 Civ. 1298 (RJH), 2004 WL 2181403, at *9

(S.D.N.Y. Sept. 27, 2004), and similar requirements for skill, effort and responsibility for jobs

performed "under similar working conditions."  *DeJohn v. Wal-Mart Stores E., LP*, 09 Civ.

01315 (GTS), 2013 WL 1180863, at *6 (N.D.N.Y. Mar. 20, 2013); *see also Graham v. Long*

*Island R.R.,* 230 F.3d 34, 40 (2d Cir. 2000) ("What constitutes 'all material respects . . . varies

somewhat from case to case," but "there should be an 'objectively identifiable basis for

comparability.'") (citations omitted).  This is generally a question of fact for the jury, but "[t]his

rule is not absolute, however, and a court can properly grant summary judgment where it is clear

that no reasonable jury could find the similarly situated prong met."  *Britt v. Merrill Lynch &*

*Co., Inc.*, 08 Civ. 5356 (GBD), 2011 WL 4000992, at *6 (S.D.N.Y. Aug. 26, 2011) (quoting

*Cine SK8, Inc. v. Town of Henrietta,* 507 F.3d 778, 791 (2d Cir. 2007)) (internal quotation marks

omitted).

### i.  Plaintiff's Claim That She Was Paid Less Than Andryshak

Plaintiff first alleges that she was paid less in stipends and salary than Andryshak, a male

custodial employee.  Pl.'s Opp. Mem. 6.  However, Plaintiff is not similarly situated to

Andryshak, whom Plaintiff admits had duties that were completely distinct from hers, had been

employed by the District for "many more years" than her, "was a 12-month employee and

supervised or coordinated a staff of between five and ten custodians.  Pl.'s 56.1 Resp. ¶ 11;

Potash Dep. 79.  She further admits that Andryshak "lacked [her] educational attainment or

technical responsibilities."  Potash Aff. ¶ 4.  In her opposition papers, Plaintiff merely speculates

that "a reasonable jury could conclude that [P]laintiff properly contrasted herself to Andryshak

because the [D]istrict chose to couple her with him for salary purposes [and] he was an

administrator who supervised individuals . . . ."  Pl.'s Opp. Mem. 15.  Accordingly, because

Plaintiff "has adduced no evidence demonstrating equal job content with [Andryshak], she did

not satisfy her *prima facie* burden," *Byrne v. Telesector Res. Grp., Inc.*, 339 F. App'x 13, 15-16

(2d Cir. 2009), and Defendants are entitled to summary judgment on Plaintiff's disparate pay

claim regarding Andryshak. *Quarless v. Bronx-Lebanon Hosp. Ctr.*, 228 F. Supp. 2d 377, 385

(S.D.N.Y. 2002), *aff'd sub nom. Quarless v. Bronx Lebanon Hosp. Ctr.*, 75 F. App'x 846 (2d

Cir. 2003) ("The Plaintiff has failed to establish a prima facie case of discriminatory pay because

he has put forward no evidence that he was paid less than other similarly situated employees.  As

a consequence, the Defendants are entitled to summary judgment on the Plaintiff's disparate pay

claims.").

ii.  Plaintiff's Claim That She Was Paid Less Than Castine

Second, Plaintiff compares herself to Castine, the tenured female elementary school

teacher who assumed Plaintiff's duties after December 2009 with the help of BOCES

technicians, and who was appointed to the new position of Director of Technology Integration in

June 2010 at a salary of $87,500.  Burnside Aff. ¶¶ 36-37; Burnside Aff., Ex. P.  Plaintiff alleges

that "a reasonable jury, understanding that Castine was given a salary of $87,500 the year

following plaintiff was compensated at $75,000 for a technically more complex position and

understanding that plaintiff had nine years' experience doing the job compared to barely one for

Castine, could conclude that her title and salary prove that plaintiff was under-compensated and

undervalued by [the District]," Pl.'s Opp. Mem. 14, but provides no legal authority for her

proposition.

Plaintiff's attempt to compare herself to Castine must fail because, *inter alia*, she fails to

account for Castine's positive performance history since Plaintiff's termination, *see* Pl.'s 56.1

Resp. ¶ 103, Burnside Aff., Ex. Q.  In this regard, it is important to note that Castine had a

director-level position and was appointed to the position after having performed Plaintiff's job function for six months to very favorable reviews.  In addition, Castine, unlike Plaintiff, was a tenured District employee.  Thus, Castine is also not similarly situated to Plaintiff.  *See Simpson v. Metro–North Commuter R.R.,* 04 Civ. 2565 (PAC), 2006 WL 2056366, at *7 (S.D.N.Y. July 20, 2006) (plaintiff's disparate pay claim failed because employees were not similarly situated regarding "seniority and performance history"); *Bryant*, 2013 WL 2359109, at *3 (finding that another individual with whom plaintiff sought to compare himself was not similarly situated with plaintiff because they had different performance histories at Merrill Lynch); *DeJesus*, 2004 WL 2181403, at *9 (evidence that comparator "performed better" was a material difference).

> ### iii.   Plaintiff's Claim That She Was Paid Less Than Individuals at Nearby Districts Performing Her Job Functions

Third, Plaintiff argues that she received a lower salary than individuals performing her job function at local school districts.  Potash Aff. ¶ 16.  In October 2006, Plaintiff prepared a "comparative salary analysis" for Directors of Technology at several Orange and Ulster County School Districts for 2005-06.  Potash Aff. ¶ 36; Potash Aff., Ex. 30.  However, as noted by the District, Plaintiff was never employed as a Director of Technology.  Rushfield Reply Aff. ¶ 10.  Moreover, Plaintiff lists her salary at the District in this "analysis" as $44,653, which was the salary that she initially received for 2006-07 when she was appointed as Instructional Technology Specialist and, after negotiations, Plaintiff earned $50,705 that year.  Burnside Aff., Exs. F, G; Burnside Aff. ¶ 15; Potash Dep. 157, 160-62, 164, 169-70.  Even if Plaintiff had been employed as a Director of Technology by the District, she has nevertheless utterly failed to provide any information of the other Directors' duties, performance histories, tenure or other such relevant information.  *Chan v. NYU Downtown Hosp.*, 03 Civ. 3003 (RMB), 2006 WL

345853, at *4 (S.D.N.Y. Feb. 14, 2006) ("While Plaintiff lists various Hospital employees and their salaries and annual increases, she fails to raise a material issue that they were similarly situated in terms of responsibilities, tenure, experience, background, qualifications, education, etc."); *Quarless*, 228 F. Supp. 2d at 384 ("While the Plaintiff offers some statistical data regarding the pay rates of various employees at the hospital . . . Plaintiff fails to show that these employees were similarly situated.  The Plaintiff offers only unanalyzed lists of the salaries of other Bronx-Lebanon employees, without accounting for differences in education, seniority, performance, or specific work duties . . . .") (internal citations omitted).  The District has also submitted evidence that the student population and teaching staff at the District is one of the smallest among the 17 districts in Orange County.  Rushfield Reply Aff. ¶ 10; Rushfield Reply Aff., Ex. B.

> iv.  Plaintiff's Claim That Slevin Received a Stipend Which Had Been Taken Away From Her

Fourth, Plaintiff claims that the District's action of giving Slevin, a male teacher, a stipend starting in summer 2009 for managing the District's website and running teacher support workshops, while eliminating her stipend for performing these duties in 2006, is evidence of discrimination.  Potash Dep. 269; Potash Aff. ¶ 21; Pl.'s Opp. Mem. 7.  As an initial matter, the Court notes that Plaintiff testified that the District stopped paying her a stipend in 2006 when she was promoted to Instructional Technology Specialist, a position whose duties included supporting the District webpage and running teacher support workshops.  Potash Dep. 269.  Furthermore, Slevin was provided a stipend for performing these duties *in addition to* his job as a teacher.  *See id*. 272; Burnside Aff. ¶ 28.  Therefore, the Court finds Plaintiff's attempt to compare her position to that of Slevin untenable.

However, even if Slevin's duties concerning the website and teacher support workshops were sufficiently similar for a *prima facie* case, the District has met its burden of producing a non-discriminatory explanation for its decision to pay Slevin a stipend.  According to Superintendent Burnside, during the summer of 2009, in order to reduce Plaintiff's workload as the District's Senior Computer Network Specialist, he "proposed, posted and negotiated with the Florida Teacher's Association a *stipend position* that would include assignment of the [D]istrict's web site management to a teacher in the Florida Teachers Association teachers bargaining unit." Burnside Aff. ¶ 28 (emphasis added).  In other words, the position was created as a stipend position expressly for the purpose of addressing Plaintiff's repeated protests that she was overworked.  Accordingly, the burden shifts then back to Plaintiff to demonstrate that her unequal pay "was motivated, at least in part, by a discriminatory reason," *Pearson v. Unification Theological Seminary,* 785 F. Supp. 2d 141, 152 (S.D.N.Y. 2011) (citation and internal quotation marks omitted), and Plaintiff here has provided absolutely no evidence that Superintendent Burnside's explanation was pretextual or that Slevin's stipend was the result of discriminatory animus based on her gender.  *Robinson v. Am. Int'l Grp., Inc.*, 08 Civ.1724 (LAK), 2009 WL 3154312, at *4 (S.D.N.Y. Sept. 30, 2009), *aff'd sub nom. Robinson v. Am. Int'l Grp.*, 396 F. App'x 781 (2d Cir. 2010); *Simpson*, 2006 WL 2056366, at *8 (S.D.N.Y. July 20, 2006); *Malatesta v. Credit Lyonnais,* 03 Civ. 3690 (MBM), 2005 WL 3117351, at *6 (S.D.N.Y. Nov. 21, 2005) ("As [Plaintiff] fails to identify a similarly situated employee who was granted a higher raise or bonus than she was . . . and she fails to produce evidence of any statements, actions, or other circumstances that concretely show [discriminatory] animus, her small . . . raise and lack of a bonus do not establish discriminatory intent.").

v.  <u>Plaintiff's Claim That She Was Generally Undercompensated</u>

Finally, Plaintiff argues that she was generally undercompensated for the amount of work that the District required her to perform.  Pl.'s Opp. Mem. 1.  Failure to provide an employee with a raise may constitute an adverse employment action where Plaintiff can show that she was denied a salary increase received by similarly situated individuals as a result of discrimination. *Rooney v. Brown Grp. Retail, Inc.*, 08 Civ. 484 (DRH) (AKT), 2011 WL 1303361, at *11 (E.D.N.Y. Mar. 31, 2011).  As the main support for her contention, Plaintiff testified that during the time she was supervised by Flaherty and Rhine, they told her that she was being underpaid. Potash Dep. 39.  She further alleges that in 2001-02, she began to suspect that she was being underpaid as a result of her gender after she "started to learn about what other people were making," and "*some* of them" were men.  *Id*. 45 (italics added).  However, Plaintiff's "claim of discrimination in pay raises is simply not supported by the record," *Lapsley v. Columbia Univ.- Coll. of Physicians & Surgeons*, 999 F. Supp. 506, 517 (S.D.N.Y. 1998), and this showing is plainly insufficient to establish a *prima facie* case.  Plaintiff fails to identify who these "other people" were, what their duties were, who their employers were or any other fashion in which the Court could conceivably conclude that "they" were similarly situated to Plaintiff.  The undisputed facts show that Plaintiff received approximately nine raises in her annual salary during her tenure at the District, starting at $24,515 in September 2000 and ending at approximately $73,000 in December 2009.  *See* Burnside Aff. ¶ 26.  Moreover, she provides no evidence whatsoever that similarly situated employees, female or not, received larger salaries or pay raises.  *Rooney*, 2011 WL 1303361, at *11; *Penney v. AIG Domestic Claims, Inc.*, 04 Civ. 9071 (NRB), 2007 WL 541711, at *8 (S.D.N.Y. Feb. 20, 2007).  As a result, Plaintiff's ongoing compensation claim is also dismissed.

### c.  Plaintiff's Adverse Employment Action Claims

In addition to her claims of disparate pay, Plaintiff alleges seven additional "adverse employment" actions:  (1) Superintendent Burnside excluded her from participating on the technology grant committee; (2) Superintendent Burnside reduced her stipend; (3) Plaintiff was not allowed to supervise Klein; (4) Superintendent Burnside imposed a lengthy probationary period; (5) the District assigned Plaintiff an excessive workload; (6) Superintendent Burnside refused to pay Plaintiff for 10 days of summertime work; (7) and Plaintiff was terminated from her position as Senior Network Specialist.

As previously discussed, to establish a *prima facie* case of discrimination under Title VII, a plaintiff must demonstrate, *inter alia,* that she was satisfactorily performing her duties and suffered an adverse employment action.  *Terry v. Ashcroft,* 336 F.3d 128, 138 (2d Cir. 2003); *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 253 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013).  To constitute an "adverse" employment action, such action must represent a "materially adverse change" in a plaintiff's terms and conditions of employment, *Mathirampuzha v. Potter,* 548 F.3d 70, 78 (2d Cir. 2008), and be "more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Galabya v. N.Y.C. Board of Education,* 202 F.3d 636, 640 (2d Cir. 2000) (citation omitted).  The Second Circuit has explained that the acts of an employer which are deemed "sufficiently disadvantageous to constitute an adverse employment action include a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation."  *Beyer v. The Cnty. of Nassau,* 524 F.3d 160, 163 (2d Cir. 2008) (quoting *Williams,* 368 F.3d at 128).  Moreover, while "there is no exhaustive list of what constitutes an adverse employment action," courts have

35

also held that "denial of promotion, addition of responsibilities, involuntary transfer that entails objectively inferior working conditions, denial of benefits, denial of a requested employment accommodation, denial of training that may lead to promotional opportunities, and shift assignments that make a normal life difficult for the employee, among other things, constitute adverse employment actions." *Little v. NBC,* 210 F. Supp. 2d 330, 384 (S.D.N.Y. 2002) (citations omitted); *see also Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998) ("Employment actions include 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'").  Changes in assignments or responsibilities that do not "radical[ly] change" the nature of work are not typically adverse employment actions.  *See Galabya,* 202 F.3d at 640 (quoting *Rodriguez v. Bd. of Ed.,* 620 F.2d 362, 366 (2d Cir. 1980)).  Moreover, a plaintiff must set forth *objective proof* that the alleged action was materially adverse.  *Beyer,* 524 F.3d at 164. ("[W]e require a plaintiff to proffer objective indicia of material disadvantage; subjective personal disappointment is not enough.") (citations and internal quotation marks omitted).

Whether a plaintiff was satisfactorily performing her job depends on the employer's criteria for job performance, and not the standards "that may seem reasonable to the jury or judge." *Thornley v. Penton Pub., Inc.,* 104 F.3d 26, 29 (2d Cir. 1997).  Therefore, negative performance evaluations can indicate that a plaintiff was not satisfactorily performing her job. *Sotomayor*, 862 F. Supp. 2d at 253-54 (*comparing Gladwin v. Pozzi,* 403 F. App'x 603, 606 (2d Cir. 2010) ("[Plaintiff] was never given a negative performance evaluation, and the record shows she was deemed by co-workers as 'very effective,' 'committed' and 'very efficient,' thus satisfying the second prong in demonstrating she was performing her duties satisfactorily"); *with Mastrolillo v. Connecticut,* 352 F. App'x 472, 473–74 (2d Cir. 2009) ("[Plaintiff] did not

establish that she performed her job satisfactorily, given the negative performance evaluations

and her admitted lack of interest in teaching certain advanced level courses.")).  A disciplinary or

counseling memorandum which "criticizes an employee without any effect on working

conditions does not constitute an adverse employment action."  *Solomon v. Southampton Union*

*Free Sch. Dist.*, 08 Civ. 4822 (SJF) (ARL), 2011 WL 3877078, at *6 (E.D.N.Y. Sept. 1, 2011),

*aff'd*, 504 F. App'x 60 (2d Cir. 2012).

Moreover, a showing of disparate treatment, meaning that an employer treated a plaintiff

"less favorably than a similarly situated employee outside [her] protected group—is a recognized

method of raising an inference of discrimination for purposes of making out a *prima facie* case."

*Mandell v. County of Suffolk,* 316 F.3d 368, 379 (2d Cir. 2003)).  However, a plaintiff relying on

disparate treatment evidence must demonstrate that she "was similarly situated in all material

respects to the individuals with whom she seeks to compare herself."  *Id*. (citation and internal

quotation marks omitted); *see also Desir v. City of New York,* 453 F. App'x 30, 34 (2d Cir.

2011).

Here, viewing the evidence in the light most favorable to Plaintiff, the Court concludes,

as a matter of law, that Plaintiff has either failed to show that the acts discussed below were

"adverse employment actions" and/or failed to show that these "adverse employment actions"

were supported by an inference of gender discrimination, by reference to similarly situated

employees or otherwise.

    i.  <u>Plaintiff's Claim That Superintendent Burnside Excluded Her From The Technology Grant Committee</u>

Plaintiff claims that Superintendent Burnside discriminated against her by excluding her

from participating in the committee formed to determine the best use of the technology grant

funds and that "[n]o male administrator was treated in a like manner."  Compl. ¶ 24; Pl.'s Opp.

Mem. 7-8.  However, in her affidavit, Dr. Aston, a non-party to this action, alleges that she was

the individual responsible for determining who sat on the committee, not Superintendent

Burnside, and that she excluded Plaintiff because Plaintiff "had repeatedly claimed to [her] in

every school year, including the 2008-09 and 2009-10 school years, that she already had more

work than she could perform."  Aston Aff. ¶ 13.  Furthermore, Plaintiff in her deposition testified

that she did not know for a fact whether Superintendent Burnside had actually excluded her from

participating in the committee.  Potash Dep. 218, 221-24.  Finally, Plaintiff "has not provided

any evidence that exclusion from the committee was or resulted in a materially adverse change in

the terms or conditions of her employment," *Solomon*, 2011 WL 3877078, at *6, nor that it could

possibly affect her "opportunities for professional growth or career advancement," *Nakis v.*

*Potter,* 01 Civ. 10047 (HBP), 2004 WL 2903718, at *20 (S.D.N.Y. Dec. 15, 2004).  Plaintiff has

also not provided any legal authority for her argument.

    ii. <u>Plaintiff's Claim That Superintendent Burnside Reduced Her Stipend</u>

    Plaintiff alleges that in May 2004, before Superintendent Burnside assumed his position,

the union had been negotiating with Rhine for a higher stipend of $9,000 per year, Potash Aff. ¶

5, Compl. ¶ 58(B), and that Superintendent Burnside "did not honor" this agreement and

"reduced" Plaintiff's stipend to $2,500 beginning in the 2004-05 school year.  Pl.'s Opp. Mem.

7.  Failure to provide an employee with a raise, or in this case a stipend, may constitute an

adverse employment action if the plaintiff can show that she was denied a raise received by

similarly situated individuals as a result of discrimination.  *Rooney*, 2011 WL 1303361, at *11;

*see also Ebanks v. Neiman Marcus Group, Inc.,* 414 F. Supp. 2d 320, 331 (S.D.N.Y. 2006).

    The Court notes that Plaintiff's proffered evidence actually indicates that the FTA,

Plaintiff's union, had made a proposal that she receive $4,500 for the 2005-06 school year and $9,000 for the 2006-07 year, Potash Dep. 58, 65; Potash Aff., Ex. 10, and Rhine did not actually secure these stipends before the arrival of Superintendent Burnside.  Potash Dep. 64.  Plaintiff further does not provide evidence of whether similarly situated individuals received stipends, and, if so, the amounts of such payments.  "Without comparing herself in this way to other [employees] similarly situated, [P]laintiff has failed to demonstrate an adverse employment action."  *Rooney*, 2011 WL 1303361, at *11.  Nor has Plaintiff provided the Court with any other basis to believe that a higher stipend amount like the one she desired was customary at the District so that denial of such an amount could constitute a materially adverse change in the terms and conditions of her employment.  *Fullwood v. Ass'n for the Help of Retarded Children, Inc.*, 08 Civ. 6739 (DAB), 2010 WL 3910429, at *6 (S.D.N.Y. Sept. 28, 2010).

However, even assuming *arguendo* that she had established an adverse employment action, Plaintiff testified that she only told Superintendent Burnside that Rhine had promised her a higher stipend *after* she learned that she would receive $2,500 for 2004-05, and he told her that $2,500 was the most the District could afford at the time.  *Id*. 66-67.  Plaintiff, however, believes that the amount evidences gender discrimination based on Superintendent Burnside's "attitude" and "[b]ecause he wasn't coming in and questioning [the amount of] . . . Andryshak's stipend," even though Andryshak's stipend had been implemented by Burnside's predecessor.  *Id*. 68. Plaintiff's speculative and conclusory allegations are insufficient to rebut Superintendent Burnside's legitimate non-discriminatory reason for not giving Plaintiff with a higher stipend.

### iii.   Plaintiff's Claim That She Was Not Allowed To Supervise Klein

In August 2009, the District provisionally appointed Klein as a Computer Technician to assist Plaintiff.  Aston Aff. ¶ 21; Burnside Aff. ¶ 27.  Plaintiff claims that she was not allowed to

supervise Klein or evaluate his job performance, while "male administrators" were "permitted to assign work to their subordinates and evaluate them."  Pl.'s Opp. Mem. 8.  In her affidavit, Plaintiff specifies that the "male administrators" are limited to Andryshak, whom she claims was allowed to supervise his subordinates, Potash Aff. ¶ 20, and further alleges that non-party Dr. Aston "interfered and essentially assigned Klein as she saw fit."  *Id.*  However, Plaintiff's duties differed significantly from those of Andryshak, making him an unsuitable comparator,[10] and more importantly, Plaintiff has once again failed to provide any evidence, or rely on any legal authority, that the inability to supervise Klein was "more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Galabya,* 202 F.3d at 640 (citations omitted).

      iv.   Plaintiff's Claim that Superintendent Burnside Imposed A Lengthy
            Probation Period

      Plaintiff complains that Defendants assigned her to a probation period of six months when she was appointed as an Instructional Technology Specialist.  Burnside Aff., Ex. G; Burnside Aff. ¶ 15.  According to Superintendent Burnside, the Board imposed a six month probation period at his recommendation; it was his practice to impose the longest probationary period available upon any appointments that he recommended.  Burnside Aff. ¶ 15.  In response, Plaintiff argues that "a janitor," either "Mr. Wheeler or another janitor," received a shorter probationary period and that this was "a further indication of Burnside's hostile attitude towards [her]."  Potash Aff. ¶ 14; Potash Dep. 227.  As previously discussed, a janitor is not an appropriate comparator for Plaintiff's position, and Plaintiff fails to provide any additional information about the janitor, including his or her name, other than hypothesizing that it *might*

---

[10] Plaintiff makes various allegations of disparate treatment by Defendants as compared to Andryshak.  As the Court has repeatedly discussed how Plaintiff and Andryshak are not similarly situated for purposes of Title VII, the Court declines to address such additional claims.  *See* Compl. ¶ 41 (The District "permitted a male manager, Andryshak, to not do work required of his position without adverse consequence.").

have been Mr. Wheeler, and job responsibilities.  *Butts v. N.Y. City Dep't of Hous. Pres.,* 00 Civ.

6307 (KMK), 2007 WL 259937, at *10 (S.D.N.Y. Jan. 29, 2007) (granting summary judgment

where plaintiff offered only "general and speculative allegations" that plaintiff was "treated

differently than similarly situated employees not of Plaintiff's protected class.").  Plaintiff further

complains that she received an additional six month probation period when she was appointed as

Senior Computer Network Specialist, Compl. ¶ 34, but fails to refute Superintendent Burnside's

legitimate non-discriminatory explanation for the length of probation period imposed.

> v.  Plaintiff's Claim that the District Assigned Her An Excessive Workload

Plaintiff contends that she was "expected to do far more than [her] job description"

required, Pl.'s Opp. Mem. 1, and Defendants did not provide her with proper support or

assistance.  Compl. ¶¶ 17-18.  Plaintiff here does not explicitly argue that her workload created

an adverse employment action.  However, "assignment of a disproportionately heavy workload"

may, in certain circumstances, constitute an adverse employment action.  *Feingold,* 366 F.3d at

152–53.  In *Feingold*, the Second Circuit explained:

> Viewing the facts in the light most favorable to [Plaintiff], a reasonable trier-of-
> fact could infer that [Plaintiff] and his white colleague, Sica, were assigned a
> heavier docket of cases as a result of discriminatory intent.  [Plaintiff] swore
> under penalty of perjury that, in [the] absence [of the white senior ALJ], Waltrous
> [, who was black,] served as "Acting Senior Judge," and that in that capacity she
> regularly reassigned cases to the white ALJs that had originally been allocated to
> the three African-American ALJs.  [Plaintiff] also attested that Isaacs, [who was
> black,] who was officially responsible for adjusting assignments, regularly
> reshuffled them to give white ALJs more work than their African-American
> counterparts.  If a trier-of-fact credited these allegations, it could conclude that
> [Plaintiff] was subjected to disparate treatment under circumstances giving rise to
> an inference of racial discrimination.

366 F.3d at 153.  Plaintiff here has only provided evidence that the District's technology

department expanded dramatically during Plaintiff's time with the District, and that the District

undertook various measures to assist Plaintiff with her job assignments, including creating two

additional positions:  assigning management of the District's website to Slevin and hiring Klein

as a Computer Technician.  Unlike in *Feingold*, Plaintiff fails to provide any evidence indicating

that Plaintiff's workload was the product of gender-based discrimination.

      vi.  <u>The District's Refusal to Pay Plaintiff for 10 Days of Summertime Work</u>

During summer 2008, while she was still in the 10-month position of Instructional

Technology Specialist, Plaintiff worked for 10 days and sought reimbursement for this work

months later on April 16, 2009.  Potash Dep. 173-77; Potash Aff., Ex. 51.  On April 30,

Superintendent Burnside denied her request for payment on the basis that there was no record of

any request being made for her to work on the summer dates specified.  Potash Aff., Ex. 51.  He

also noted that the contract between the FTA and the District indicated that payment for

summertime work was at the "discretion" of the District.  *Id*.  Plaintiff alleges that she eventually

spoke to Superintendent Burnside about her pay request and he accused of her of lying about her

lack of awareness of the District's discretionary policy.  Potash Dep. 192-94.  In the end,

however, the FTA entered into an agreement with the District whereby Plaintiff received

payment for 5 of the days she worked.  Potash Aff., Exs. 5, 53; *see also* Compl. ¶¶ 19-21; Pl.'s

Opp. Mem. 7.  Plaintiff contends that "[t]here is no evidence that [Superintendent Burnside]

treated any male employee in a like manner."  Pl.'s Opp. Mem. 7.

Plaintiff acknowledged in her deposition that the November 2008 contract contained

language granting the District "discretion," that she learned about the discretionary language in

November 2008, and that she decided to wait until April 2009 to submit her timesheet, albeit it at

the counseling of Dr. Aston and Frank Gannon, a union representative.  Potash Dep. 181-86.

Plaintiff alleges that "no male employee" was treated "in a like manner," however, she

fails to provide the Court with the name of any potential comparator.  Furthermore, she has failed

to rely on any legal authority in defending her argument.  Regardless, "[c]ourts have generally

accorded deference to employer actions taken pursuant to company policy, including one

governing discretionary bonuses, particularly when the details of such policy is available to

employees and has a rational basis."  *Portee v. Deutsche Bank*, 03 Civ. 9380 (PKC), 2006 WL

559448, at *10 (S.D.N.Y. Mar. 8, 2006) (citing *Malatesta*, 2005 WL 3117351, at *6).  As

Plaintiff fails to produce any statements, actions, or other circumstances that concretely show

gender animus, the District's failure to pay her for 5 days does not establish that such action was

motived by her gender.

> vii.  Plaintiff's Termination[11]

> > 1.  *Prima Facie Case*

Plaintiff's termination is undoubtedly an adverse employment action.  Defendants do not

dispute this, but rather contend that the circumstances under which Plaintiff was fired do not give

rise to an inference of discrimination.  An inference of discrimination "is a flexible standard that

can be satisfied differently in differing factual scenarios."  *Moore v. Kingsbrook Jewish Med.*

*Ctr.*, 11 Civ. 3625 (MKB), 2013 WL 3968748, at *6 (E.D.N.Y. July 30, 2013) (quoting *Howard*

*v. MTA Metro–N. Commuter R.R.,* 866 F. Supp. 2d 196, 204 (S.D.N.Y. 2011) (brackets and

internal quotation marks omitted).  Additionally, "[n]o one particular type of proof is required to

show that Plaintiff's termination occurred under circumstances giving rise to an inference of

---

[11] Although not explicitly stating so, Plaintiff appears to allege that one of Dr. Aston's November 2009 counseling memoranda and Principal Rheaume's November 2009 letter constitute adverse employment actions.  Compl. ¶¶ 45, 53.  "Excessive scrutiny and negative evaluations do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation."  *Ellis v. N.Y.C. Dep't of Educ.*, 07 Civ. 2042 (FB), 2010 WL 2816334, at *5 n.4 (E.D.N.Y. July 16, 2010) (citation and internal quotation marks omitted).  "Here, of course, the observations and evaluations contributed, in some sense, to [Plaintiff's] termination, a stand-alone adverse employment action; therefore, the Court need not address [these evaluations] separately."  *Id.*

discrimination." *Id.* (quoting *Ofoedu v. St. Francis Hosp. & Med. Ctr.,* 04 Civ. 1707 (PCD),

2006 WL 2642415, at *14 (D. Conn. Sept. 13, 2006)) (internal quotation marks omitted).  For

example, an inference of discrimination can be drawn from an employer's "invidious comments

about others in the employee's protected group; or the more favorable treatment of employees

not in the protected group; or the sequence of events leading to the plaintiff's discharge."  *Id.*

(quoting *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 468 (2d Cir. 2001)) (internal

quotation marks omitted); *id.* (citing *Russell v. Cnty. of Nassau,* 696 F. Supp. 2d 213, 232

(E.D.N.Y. 2010) ("[A] discriminatory race and/or color motive can be inferred if a plaintiff was

treated differently than similarly situated white employees or if the defendants engaged in a

pattern of discriminatory treatment of African–American employees.").

     Plaintiff asserts that she interpreted gender discrimination in Superintendent Burnside's

"attitude" during the 2004-05 school year, and believed that he might not select a woman as a

Director of Technology because she had a "feeling" that he was not confident in her ability to

assume this position because of her gender and that he was being forced to create the position for

her.  Potash Dep. 68, 96-99, 115.  However, Plaintiff's "mere subjective belief that [s]he was

discriminated against because of [her] [gender] does not sustain a [gender] discrimination

claim."  *Gue v. Suleiman,* 10 Civ. 8958 (RLE), 2012 WL 4473283, at *8 (S.D.N.Y. Sept. 27,

2012) (quoting *Baptiste v. Cushman & Wakefield,* 03 Civ. 2102 (RCC), 2007 WL 747796, at *7

(S.D.N.Y. Mar. 7, 2007)) (internal quotation marks omitted); *see also Karim–Seidou v. Hosp. of*

*St. Raphael,* 09 Civ. 51, 2012 WL 6628886, at *5 (D. Conn. Dec. 19, 2012) (plaintiff's "own

subjective beliefs" that he was discriminated against based on national origin and race were

insufficient to survive summary judgment).

Plaintiff also asserts that during a May 2009 telephone call with Superintendent Burnside, he told her that she needed to "act more like" Rob Gravelle, a male athletic director, because "he took everything in stride."  Potash Dep. 398.  Plaintiff in her opposition memorandum argues that such a statement was "a baseless stereotypic comment which cast [P]laintiff as too soft to serve as the Director of Technology."  Pl.'s Opp. Mem. 19.  However, Plaintiff's characterization is unsupported by the record.  Superintendent Burnside's statement is a facially-neutral comment which this Court finds, considered singly or together with the evidence in the record, does not support an inference of gender discrimination.

Finally, Plaintiff alleges that she told Dr. Aston that she felt that Superintendent Burnside was not paying her what she deserved because of her gender and that Dr. Aston responded, "[W]e have all felt it, don't you think we all feel it[?]"  *Id.* 251-52.  Dr. Aston then "spread her hand in front her" which Plaintiff took to mean that Dr. Aston was pointing out an additional woman who had been discriminated against, Lisa Tiger, whose office was across the hall.  *Id.* 254-55.  Viewing the facts in the light most favorable to Plaintiff, Dr. Aston's alleged statement and hand gesture are blatantly conclusory and do not point to discriminatory animus by Superintendent Burnside.

Plaintiff also alleges disparate treatment by Principal Rheaume through what appears to be evidence typically associated with a hostile work environment claim.  *See generally* Potash Dep. 281-82, 284, 382-38 (alleging, *inter alia*, that Principal Rheaume made belligerent comments to Plaintiff and addressed her in an aggressive manner, and that several employees had told Plaintiff that Principal Rheaume hated women).  The Court notes that Plaintiff has not brought a claim asserting a hostile work environment or discussed any such potential claim with relevant legal authority in her opposition papers.  *See generally* Compl. ¶¶ 66-67 (asserting as

45

her causes of action "inferior terms and conditions" and termination of her employment).  In any

event, the record here fails to support a cause of action based on a hostile work environment.

Moreover, the evidence in the record demonstrates that Superintendent Burnside's

recommendation to the Board that it terminate Plaintiff's employment was spearheaded by Dr.

Aston, a female.  "Courts have recognized that an allegation that a decision was motivated by

[discriminatory animus] is weakened when the decisionmakers are members of the protected

class as the plaintiff."  *Moore*, 2013 WL 3968748, at *11 (collecting cases); *see also White v.

N.Y.C. Dep't of Educ.,* 05 Civ. 2064 (RRM) (LB), 2008 WL 4507614, *6 (E.D.N.Y. Sept. 30,

2008) (the fact that the denial of additional resources came from plaintiff's own African–

American supervisor, a female teacher in the same protected class as plaintiff, rendered plaintiff's

"speculative and conclusory claims of racial, ethnic or gender prejudice even less plausible.").

Finally, the District replaced Plaintiff with Castine, another woman, "further weakening" her

claim for gender discrimination.  *Dabney v. Christmas Tree Shops*, 10 Civ. 8734 (CS), 2013 WL

3820668, at *5 (S.D.N.Y. July 24, 2013) (citing *Jean–Gilles v. Cnty. of Rockland,* 195 F. Supp.

2d 528, 533 (S.D.N.Y. 2002) (racial discrimination claim weakened when one minority was

replaced with another minority)).  Accordingly, upon review of the entire record, the Court finds

that Plaintiff has failed to satisfy her "de minimis" burden of establishing a *prima face* case of

gender discrimination in the decision to terminate her employment.

> 2.  *Defendants' Legitimate, Non-discriminatory Reasons for Termination*

However, even if the Court were to find that Plaintiff has made out a *prima facie* case,

Defendants have met their burden of articulating a legitimate, non-discriminatory reason for

Plaintiff's termination.  Defendants assert that Plaintiff was terminated due to her poor job

performance, *see generally* Defs.' Mem. 15, and have provided the following evidence:

- Dr. Aston's 2006-07 annual evaluation noted that Plaintiff needed to improve her cooperation with administrators.  Aston Aff., Ex. B; Aston Aff. ¶ 5.

- Dr. Aston's 2007-08 annual evaluation reduced Plaintiff's grades from "Exceeds Expectations" to "Meets Expectations" in the categories "Responds to tech problems in a timely and thorough manner," "Organizes tasks to achieve maximum results," and "Promotes efficient operation of technology program through expertise and personal commitment."  According to Dr. Aston, these reductions were the result of reports from teachers and administrators and Plaintiff's failure to promptly address teacher and school technology needs.  Aston Aff., Ex. C; Aston Aff. ¶ 6.  Dr. Aston downgraded Plaintiff from "Exceeds Expectations" to "Needs Improvement" in the category "Communicates with supervisor in a timely manner," as a result of Plaintiff's habitual failure to advise Dr. Aston of problems that were arising and failure to promptly respond to Dr. Aston's communications.  Aston Aff. ¶ 7.

- Dr. Aston's 2008-09 annual evaluation, reducing Plaintiff's grades from "Meets Expectations" to "Needs Improvement" in the categories "Responds to tech problems in a timely and thorough manner" and "Organizes tasks to achieve maximum results."  Aston Aff., Ex. H.  Dr. Aston once again classified Plaintiff as "Needs Improvement" in the category "Communicates with supervisor in a timely manner."  Aston Aff. ¶¶ 16-17.

- On August 27, 2008, Plaintiff failed to attend the new teacher orientation although she had previously committed to attending.  *See id.* ¶ 16.  On September 2, Dr. Aston issued a related memorandum.  Aston Aff., Ex. I.

- On September 18, 2009, Dr. Aston issued a memorandum discussing problems from the first two weeks of the school year.  Dr. Aston's concerns included, *inter alia*, Plaintiff "[r]epeatedly being inaccessible," not completing tasks in a timely fashion," responding to requests for help with sarcasm, hostility, or disinterest, and failing to make the Right to Know video accessible to all employees.  *Id.*, Ex. O.

- Dr. Aston's November 13, 2009 formal counseling memorandum reiterated Plaintiff's performance issues, and discussed her failure to remove 'blocks' for Superintendent's Day and problems reaching Plaintiff.  *Id.*, Ex. P.

- Dr. Aston's November 24, 2009 formal counseling memorandum discussed the problems with the Right to Know video set-up and stated that as a result of

Plaintiff's failure to follow through with assigned tasks, Dr. Aston was being forced to assume some of Plaintiff's responsibilities.  *Id.*, Ex. Q.

- That same day, Dr. Aston met with Plaintiff for a formal counseling session concerning her failure to set up a Smart Board and issued a related counseling memorandum on November 25.  *Id.*, Ex. R; Aston Aff. ¶ 29.

- On November 25, 2009, Principal Rheaume provided Dr. Aston with a letter addressing three issues that had arisen since August 2009.  Specifically, he discussed problems with SchoolTool training; problems with wireless access in the cafeteria for Back to School Night; and failure to properly install a Smart Board.  He further noted that Plaintiff:  "[D]oes not perform the necessary background work to successfully accomplish a task.  When she is questioned about the lack of follow through, she becomes defensive and increasingly uncooperative.  There is a consistent pattern of this behavior, accompanied by a negative attitude."  Aston Aff., Ex. S.

*See also id.*, Exs. J, M.  Poor work performance "always constitute[s] [a] legitimate and nondiscriminatory reasons for terminating employment . . . ."  *Risco,* 868 F. Supp. 2d at 109 (citations, alterations and internal quotation marks omitted).  Moreover, "[t]he submission of evaluations of Plaintiff's performance, memoranda, and the written warnings constitutes permissible support for Defendants' proffered explanation."  *Ofoedu*, 2006 WL 2642415, at *15 (citing *Meiri,* 759 F.2d at 995) ("In determining whether an employee's job performance is satisfactory, courts may—as they often must—rely on the evaluations rendered by supervisors.")); *Ortiz-Moss v. N.Y.C. Dep't of Transp.*, 623 F. Supp. 2d 379, 394 (S.D.N.Y. 2008) ("In determining whether an employee's job performance is satisfactory, courts may-as they often must-rely on the evaluations rendered by supervisors.  After all, job performance cannot be assessed in a vacuum . . . .") (citation and internal quotation marks omitted).  The record in this case clearly supports Defendants' position that Plaintiff was not performing her job satisfactorily.

3.   *Plaintiff's Evidence of Pretext*

Because Defendants have provided a legitimate, non-discriminatory reason for Plaintiff's termination, the burden shifts back to Plaintiff to come forward with evidence that Defendants' proffered legitimate, non-discriminatory reason is pretextual, thus supporting an inference that the real reason for Plaintiff's termination was discriminatory.  A plaintiff can establish an unlawful employment practice by demonstrating that sex was "a motivating factor for an[] employment practice, even though other factors also motivated the practice."  42 U.S.C. § 2000e–2(m) (emphasis added).  Here, Plaintiff has presented no evidence that would lead a reasonable jury to conclude that Defendants' proffered reason for her termination is pretextual or that Defendants discriminated against her.

Plaintiff's arguments with regard to pretext consist of her own opinions of her qualifications and performance, her disagreement with Dr. Aston and Principal Rheaume's assessment of her performance, and allegations that she was often blamed in the evaluations for mistakes made by others.  Potash Aff. ¶¶ 24-26; Potash Dep. 333-34, 426-27, 461, 466-67.  In her opposition papers, Plaintiff makes purely speculative arguments that Defendants' proffered explanation for her termination was pretextual:

> A reasonable jury could . . . credit each of plaintiff's explanations in response to the criticisms leveled at her by Aston and Rheaume in the period September through November 2009 and dismiss those criticisms as gender bias on the part of Rheaume, who was viewed as a woman hater by a significant number of females . . . and whose pressure caused Aston to turn against the plaintiff.

Pl.'s Opp. Mem. 21.  Plaintiff's personal disagreements with Dr. Aston and Principal Rheaume's evaluation of her job performance are insufficient, as a matter of law, to preclude summary judgment.  *Khan v. Abercrombie & Fitch, Inc.*, 01 Civ. 6163 (WHP), 2003 WL 22149527, at *6 (S.D.N.Y. Sept. 17, 2003) (citing *Ponniah Das v. Our Lady of Mercy Med. Ctr.*, 00 Civ. 2574

(JSM), 2002 WL 826877, at *9 (S.D.N.Y. April 30, 2002) ("An employee's opinion that a performance review was unfair, supported only by [her] own conclusory statements to that effect, cannot bootstrap her claims into a Title VII claim.")) (citation and internal quotation marks omitted); *see also Boata v. Pfizer, Inc.*, 10 Civ. 4390 (KBF), 2013 WL 432585, at *5 (S.D.N.Y. Jan. 31, 2013) ("[A]n employee's disagreement with her employer's evaluation of her performance is insufficient to establish discriminatory intent," quoting *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 576 (S.D.N.Y. 2010)); *Ofoedu*, 2006 WL 2642415, at *18 (holding that even if a plaintiff could show that Defendant's criticism of him was unwarranted, "faulting others for, or otherwise rationalizing, problems legitimately perceived by [his] employer does not establish pretext," quoting *Taylor v. Polygram Records*, 94 Civ. 7689 (CSH), 1999 WL 124456, at *10 (S.D.N.Y. Mar. 8, 1999)).

The parties argue at length over Dr. Aston's role in Plaintiff's termination.  Plaintiff contends that Superintendent Burnside told Dr. Aston to document Plaintiff's performance issues to "create a paper trial which could be used against her," Pl.'s Opp. Mem. 19, and that Dr. Aston "falsely blamed" Plaintiff in her counseling memoranda.  *Id.* at 5, 13.  In her affidavit, Dr. Aston stated that she spoke to Superintendent Burnside who instructed her that if the issues with Plaintiff's performance were sufficiently serious, she should formally document the problems in counseling memoranda.  Aston Aff. ¶ 25; *see also* Burnside Aff. ¶¶ 29-30.  Plaintiff's assertion that Dr. Aston had a motive to lie is conclusory and she proffers no evidence of pretext, other than her own subjective belief that she was discriminated against because she is female. Accordingly, the Court will not disturb Defendants' judgment in terminating Plaintiff's employment.  *Mixon v. Buffalo Medical Group, P. C.,* 10 Civ. 1043 (SR), 2013 WL 597594, at *6 (W.D.N.Y. Jan. 28, 2013) ("[A]n employee's unsupported subjective belief that she was

50

being discriminated against is insufficient to establish that the employer's articulated legitimate reason for its employment action is a pretext for illegal discrimination," citing *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 456 (2d Cir. 1999)).

### IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The Clerk's Office is respectfully directed to terminate this motion (Doc. 21) and to close this case.


SO ORDERED.

Dated:     September 17, 2013
           New York, New York


Edgardo Ramos, U.S.D.J.

51